UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JOHN HESCOTT, et al.,

     Plaintiff,                    Case Number 10-13713
                                        Honorable Thomas L. Ludington

v.

CITY OF SAGINAW, et al.,

     Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DISMISSING COUNTS I, II, V, VI, VII WITH PREJUDICE, DISMISSING COUNT III IN PART WITH PREJUDICE AND AMENDING THE SCHEDULING ORDER

On July 18, 2009, the City of Saginaw demolished a residence owned by Plaintiffs located at 1002 Webber Street in the City of Saginaw. The Plaintiffs, John Hescott and Benjamin Hescott, bring this action against the Defendants, City of Saginaw ("the City"), John Stemple, Scott Crofoot, Gregory Barton and Rohde Bros. Excavating, Inc. (collectively, "Defendants"), alleging violations of the Constitution of the United States, the Constitution of the State of Michigan, various Michigan statutes, and the Michigan common law. Defendants have filed a motion for summary judgment, contending that they are entitled to judgment as a matter of law with regard to all of the claims set forth in Plaintiffs' Complaint except Count IV alleging an inverse condemnation claim against the City. ECF No. 11.

Oral argument was heard on Defendants' motion on March 21, 2012. For the reasons provided herein, the Court will grant in part and deny in part Defendants' motion. Plaintiffs, however, have not responded to Defendants' arguments on the state law claims, contending that the Court must first affirmatively exercise supplemental jurisdiction. Indeed, when Defendants removed

both the federal and state law claims, the Court had supplemental jurisdiction pursuant to 29 U.S.C.

§ 1367(a) because the state law claims are related to the federal claims and the Court has not

declined jurisdiction.  Supplemental briefing from Plaintiffs is thus necessary on these issues.

## I.    Facts

Plaintiff Hescott purchased a house located at 1002 Webber Street in Saginaw in 200l.

Hescott lived in the house for several years before moving to Flint. *Id.* at 8, 17. After moving, he

leased the two-family dwelling to tenants. When Hescott purchased the house it was in poor

condition. He needed to make many repairs to bring it up to code. ECF No. 18 Exs. A at 9, B. In

2007, he spent approximately $10,000 to replace the roof and install seamless gutters. The City's

code enforcement history demonstrates that Hescott promptly responded to any code violations and

fixed any problems. ECF No. 18 Ex. C at 008-10. The code enforcement history also reflects that

the enforcement officers had John Hescott's current telephone number and had contacted him at that

phone number in the past. *Id.*

Hescott is a member of the United States Armed Forces. He is a Chief Warrant Officer, 4th

Class, helicopter pilot. He was first deployed to Afghanistan in 2003. He was again deployed to

Afghanistan in 2006 for 18 months. He spent May 31 to June 30, 2009 in Iraq and Afghanistan and

served another 13 months on active duty in Afghanistan in 2011-2012. He returned to the United

States in May 2012. In 2008, Hescott tried to sell the house when he was relocated to the Fort

Rucker Aviation base in Ozark, Alabama. Hescott was unable to sell the house and took it off the

market. John and his wife also maintain a home on Bray Road in Flint, Michigan.  Plaintiff

Benjamin Hescott, John's son, is included on the deed to the house but is a "silent partner basically"

according to John. ECF No. 11 Ex. H at 31. Benjamin Hescott lives in Howell, Michigan.

-2-

On July 11, 2009, Hescott traveled to Michigan while on leave from the army and inspected the Saginaw house. He discovered that the basement wall on the west side of the house was damaged. Hescott testified that the house did not look any worse in the pictures the City took one week later on July 18,2009 when they demolished it. ECF No. 18 Ex. A at 75. After discovering the damage, on July 12, 2009, Hescott called his usual assistants, Shawn Taylor and Josh Weatherwax, to fix the foundation wall. Neither Taylor nor Weatherwax are licensed builders. According to Hescott, he asked them to investigate the damage, tell him whether it could be fixed, the amount of money required to fix the damages and whether it was safe to wait several weeks to do the work. Hescott believed that Weatherwax and Taylor investigated the damage sometime between July 13 and July 16, 2009. ECF No. 18 Ex. at 79. Hescott called Weatherwax on or about Friday, July 17, 2009 to get a report on the house. He also asked whether they felt safe working in the house because Hescott could not return to Michigan until August and wanted to assist with the repairs. ECF No. 18 Ex. at 58-59.

The assistants determined that the problem could be fixed. ECF No. 18 Ex. E at 40. Taylor concluded that they could use steel beams to support the house while they fixed the wall. *Id.* Both assistants testified that they were not concerned for their safety while in the house. ECF No. 18 Ex. E at 35; Ex. F at 30-32. The assistants determined that temporary supports could be installed and once installed, they could fix the wall that had fallen into the basement. Weatherwax thought that it looked like the wall opposite to the failed wall likely failed in the past and was similarly fixed. ECF No. 18 Ex. F at 33, 53. Taylor estimated that the foundation wall could have been repaired within one or two days. ECF No. 18 Ex. E at 59. He believed that the house would be fine in the interim between his visit and the target repair date. *Id.* at 62-63.

Defendant Scott Crofoot is the City's Dangerous Building Inspector. His position is funded through federal Community Block Grant Funds. ECF No. 18 Ex. G at 30. Defendant John Stemple is the Chief Inspector. Crofoot and Stemple are part of the City's Community Development Department. Odail Thoms is the chief executive of the Department. The City received almost $3,000,000 during the relevant time period to demolish property within the City. ECF No. 18 Ex. H.

At 12:19 p.m. on Saturday, July 18, 2009, City Police Officer Ian Wenger responded to a call from Central Dispatch regarding a suspicious situation at 1002 Webber. While checking for noises coming from the house based on a call from an unknown person to Central Dispatch, Officer Wenger observed that the basement wall of the building had collapsed inside. Because of the condition of the structure, Officer Wenger contacted "code enforcement" for the City. Officer Wenger explained that he called code enforcement "[b ]ecause the basement wall had fallen in and it appeared to be in a condition which would pose a hazard to somebody." ECF No. 11 Ex. A at 14. Officer Wenger was concerned with the possibility of the structure falling down or people accessing the building from the collapsed basement.

As a result of Officer Wenger's observations at 1002 Webber, John Stemple, the Chief Inspector for the City who was in Traverse City at the time, was contacted by Central Dispatch. Stemple testified that he was advised that an officer had responded to a call at 1002 Webber and that the officer reported that there were children playing in the vicinity of the house and that it appeared unsafe. Being out of town at the time, Stemple contacted Scott Crofoot, the City's Dangerous Buildings Inspector, to respond to the scene. Scott Crofoot testified that Stemple told him that the police had called; that there had been a call about a disturbance; and that when the officer responded,

-4-

he found a collapsed basement wall. ECF No. 11 Ex. C at 41.

Scott Crofoot arrived on the scene at 12:45 p.m.  Upon arrival, Crofoot observed that the west wall had collapsed into the basement and, looking at the back wall and front corner, the house appeared to have rotated.  Crofoot also heard the house creaking. While he was on the scene, Crofoot had to escort two 6 to 8 year old boys, who were playing on the front porch of 1002 Webber, back to their home next door. After assessing the situation, Scott Crofoot contacted John Stemple and described the deterioration of the foundation and the shifted building to him.  Stemple advised Scott Crofoot to contact the Fire Marshal, Greg Barton, and to then make a decision about the action to be taken.  Under the City's Dangerous Buildings Ordinance, the Fire Marshal can authorize an emergency demolition.

Scott Crofoot contacted Greg Barton and advised him that he was on scene at 1002 Webber and that one of the walls had collapsed.  Greg Barton arrived on scene at 1:48 p.m.  Crofoot and Barton entered the basement of the house and Crofoot took pictures of the interior of the basement. Crofoot explained that he and Barton were in the basement for only 2 to 3 minutes because they did not feel safe inside the home.  Barton did not want to continue past the basement stairway.   Scott Crofoot and Greg Barton together made the determination that the house should be demolished. Crofoot summarized the reasons for the emergency demolition as follows:

> [I]f just the foundation had collapsed, it probably wouldn't have needed to come down; but there were other contributing factors. First of all, the house had rotated on its axis. It had rotated. It would have been - it rotated counter-clockwise. There were three support beams in the - excuse me-one support beam with three support posts under it. Two of those support posts were rotted and only had a small portion of their base actually sitting on concrete. The rest had rotted away. The beam above them was rotted and cracked.

ECF No. 11 Ex. C at 27-28.[1]  Scott  Crofoot  further explained the rationale for an emergency

demolition of the house as follows:

> My concern was that it wouldn't stay standing through the night after seeing the condition of the main beam, hearing the creaking that was going on with the light wind outside, and in concurrence with the fire marshal who did not want to send firefighters in if there was a fire in the future because of the danger of the building or the weakness of the west wall, the foundation had collapsed.
>
> The walls on the first and second floor above that had started to drop and were deflecting outward, and I didn't believe it was going to stay. I didn't believe it would stay up through the night.

ECF No. 11 Ex. C at 73.

Having found children playing on the front porch of the house when he arrived, Scott

---

[1]Scott Crofoot described what is depicted in each of the photographs attached to Defendants' motion for summary judgment as Exhibit F. Photo 1 shows the collapsed foundation wall and deflection past the wall on what is still remaining. ECF No. 11 Ex. C at 64. Photo 2 shows deflection inward and a rotation at the end of the house along the south wall. ECF No. 11 Ex. C at 65. Photo 3 shows the front of the house. *Id.* Photo 4 shows the collapsed wall, deflection at the other end of the wall opposite what is shown in Photo 1 and also shows the deflection of the area above the foundation wall that had collapsed. ECF No. 11 Ex. C at 65. Photo 5 shows how the northwest corner interior wall had been pushed in by the blocks falling out behind it.ECF No. 11 Ex. C at 66-67.

Photo 6 shows the cracked and bowed main support beam. ECF No. 11 Ex. C at 67. Photo 7 is one of the support posts under the main support beam, showing that only a small portion of one side was sitting on concrete and that the remainder was rotted. *Id.* Photo 8 shows the interior side of the wall that had collapsed, including water damage and mold at the base of peg board that had been in front of the wall. ECF No. 11 Ex. C at 67-68. Photo 9 shows the electrical panel on the southern wall and shows the deflection of that wall. It also shows a 2 x 4 that has pulled away from the top. ECF No. 11 Ex. C at 68-69.

Photo 10 shows a "jack post" that had apparently been placed as a temporary support and also shows deterioration of the south foundation wall underneath the stairs. ECF No. 11 Ex. C at 69. Photo 11 shows another "jack post" improperly installed on a 2 x 4 laid on its side instead of on a beam. Although not depicted in the photo, Crofoot testified that the "jack post" was also not placed on a pad at its base and, due to the improper placement, it was not supporting much weight. ECF No. 11 Ex. C at 69-70. Photo 12 shows a couch that was pushed out away from the wall by the collapsed wall and also shows the peg board that was pushed in by the collapsed wall ECF No. 11 Ex. C at 70.

Photos 13, 14, 15 and 16 are photos of the support beam. ECF No. 11 Ex. C at 71. Photos 13 and 15 show how the beam had rotted, and how it rotated as evidenced by the existence of an area of exposed, unpainted wood. ECF No. 11 Ex. C at 71. Photo 14 is the opposite side of the beam shown in Photo 13 and depicts a crack running from top to bottom of the main beam. ECF No. 11 Ex. C at 71. Crofoot stuck a knife in the beam and was able to sink the blade an inch and a half into the rotted beam. ECF No. 11 Ex. C at 71. Photo 16 depicts another post deteriorated at the base. ECF No. 11 Ex. C at 71. Photo 17 is the underside of the main support beam and shows splitting of the beam. ECF No. 11 Ex. C at 72.

Crofoot's notes also reflect that they have been altered since the day of the demolition.  In particular, the heading of his notes states "Fire Emergency Demo" with the word "Fire" crossed out.  He also changed the times that he arrived on and left the scene, as well as the cost of the demolition.

Crofoot was concerned about the safety of children in the area if the house collapsed. ECF No. 11 Ex. C at 85. Fire Marshal Greg Barton agreed that there was a great possibility that the building would collapse at any time. ECF No. 11 Ex. D at 20-21. He explained his safety concerns as follows:

> The building is open and accessible now with the collapse of this side on the west side of the building. We had kids on bicycles down Webber and Van Etten - Van Etten. The fact that someone could go inside the structure was my primary concern.

ECF No. 11 Ex. D at 25. Fire Marshal Barton concurred with Crofoot that this was an emergency situation under the City's Dangerous Buildings Ordinance. ECF No. 11 Ex. D at 18-19. Section 151.120 of the City's Dangerous Buildings Ordinance (§ 151.110 et seq of the City's Administrative Code) provides:

§151.120 EMERGENCY CASES.

> In cases where there is evidence of an immediate and serious danger to the public safety or health unless a dangerous building or structure as defined in this subchapter is immediately demolished or otherwise made safe, the Chief Inspector shall report such facts to the City Manager who may cause the immediate repair or demolition of such dangerous building or structure. Determination of immediate and serious danger to the public safety or health shall be determined by the Chief Inspector and/or others such as the City Fire Marshal. Further, under the provisions of Section 2.201 (b) of the Uniform Fire Code, as adopted and amended by the City, the Fire Marshal may declare a building unsafe and order its repair, rehabilitation, or demolition. Under the provisions of this subchapter, the Fire Marshal may order or direct the Chief Inspector to proceed under the emergency provisions of this section or may do so himself or herself. Situations which may lead to the immediate potential for injury, death, spread of disease or infection, or for property or structural damage shall indicate an immediate and serious danger to the public safety or health. The potential for harm to emergency personnel who may have to re-enter such structures in the course of their duties may also be used to determine immediate and serious danger to public safety or health. The costs of such emergency repair or demolition shall be collected in the manner as provided for in § 33.26.

ECF No. 11 Ex. E § 151.120. The vast majority of the emergency demolitions that Barton has authorized have been fire related. ECF No. 18 Ex. I at 52-55.  Barton did not consider boarding up the windows, fencing off the area, stabilizing the structure or repair instead of demolition.

-7-

Having made the determination that the property was an immediate and serious danger to the public safety, Scott Crofoot contacted Rohde Bros., the contractor with whom the City has a contract to perform demolition services, to demolish the house. He also contacted Consumers Energy to disconnect the gas lines. The demolition occurred in the afternoon on July 18, 2009. The City did not notify the owners of the property either before or after the demolition because the City does not require that notification be provided in emergency situations. ECF No. 11 Ex. C at 25,38,91; Ex. Bat 91; Ex. E §151.120. In non-emergency situations, the City's Dangerous Buildings Ordinance provides for written notice to the owner of record and the right to a hearing before demolition takes place. ECF No. 11 Ex. E §§ 151.113-.118. The City likewise did not have a policy to provide any post-deprivation notice. ECF No. 18 Ex. J at 91.

The demolished house and its contents remained on the property until Monday July 20, 2009, because the landfill was closed during the weekend. An inventory of salvageable items was not made. Rohde Brothers later re-entered the property to complete the final grade, and Crofoot returned on October 13, 2009 to inspect the final grade.

Plaintiffs deny that the house was an immediate and serious danger to the public safety, but do not dispute that one of the foundation walls had collapsed. Plaintiffs believe that the City could have safely delayed the demolition to alert Plaintiffs of the concerns in order to arrange for an immediate repair. Plaintiffs subsequently obtained a structural engineering report which concluded that if the house had collapsed, it was unlikely that the collapse would have injured another property. ECF No. 18 Ex. K.

-8-

## II.    Standard of Review

A motion for summary judgment should be granted if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party asserting that a fact cannot be proven or is genuinely disputed must support the assertion by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).  The party seeking summary judgment has the initial burden of informing the Court of the basis for its motion, and identifying where to look in the record for relevant facts "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the opposing party who must "set out specific facts showing a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  If the opposing party fails to raise  genuine issues of fact and the record indicates the moving party is entitled to judgment as a matter of law, the court shall grant summary judgment.  *Anderson*, 477 U.S. at 250.

The court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.  The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).  A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the

jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

### III.   Discussion

### A.   Plaintiffs' Federal Constitutional Claims Against the City

Plaintiffs' Complaint alleges three separate federal constitutional claims against the City: (1) violation of procedural due process; (2) violation of substantive due process; and (3) violation of the Fourth Amendment. Plaintiffs characterize their Fourth Amendment claim as alleging two separate violations: (1) when the City demolished Plaintiffs' house without their consent or a court order and (2) when the City completed destroying the house and its contents by disposing of it in a landfill without Plaintiffs' consent or a court order. Defendants argue that the City is entitled to summary judgment as to each of these claims which are addressed separately below. To the extent Plaintiffs seeks punitive damages against the City for these alleged constitutional violations under 42 U.S.C. § 1983, Defendants contend that any such claims should also be dismissed because a municipality is immune from punitive damages under §1983. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981).

The liability of counties and other municipal entities under 42 U.S.C. § 1983 is governed by *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Under *Monell*, if an "action pursuant to official municipal policy of some nature caused a constitutional tort," then the municipality is liable as the wrongdoer. *Id.* at 691. "To succeed on a municipal liability claim, a plaintiff must establish that his or her constitutional rights were violated and that a policy or custom of the municipality was the 'moving force' behind the deprivation of the plaintiff's rights." *Miller v. Sanilac Cnty.*, 606 F.3d 240, 254-55 (6th Cir. 2010). Local governmental units may only be held liable when "action pursuant to official municipal policy of some nature causes a constitutional tort,"

and not on the basis of respondeat superior. *Monell*, 436 U.S. at 691. In this regard, a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. *Id.* at 694. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* Under *Monell*, there are several avenues available for a plaintiff to prove the existence of a municipal policy, including: (1) a formally promulgated policy; (2) a well settled custom or usage; and (3) a final decision by a municipal policymaker. *Id.* In this particular case, however, the Plaintiffs cannot establish a viable claim under any of the available theories.

A policy "implies a course of action consciously chosen from among various alternatives." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985). The clearest type of policy is one formally embodied in a "policy statement, ordinance, regulation or decision officially adopted and promulgated" by the municipality's lawmaking body. *Monell*, 436 U.S. at 690. These municipal policies are typically intended to "establish fixed plans of action to be followed under similar circumstances consistently and over time." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986). Municipal policy need not be a written ordinance; it may be a "statement" or "decision" by a high-ranking official, such as a sheriff or prosecutor, "whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 690, 694. Municipal liability may be imposed for a single decision by an official who "possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur*, 475 U.S. at 482 (imposing municipal liability as a result of the county prosecutor's decision). The requirement that a municipality's wrongful actions be a "policy" is not meant to distinguish isolated incidents from general rules of conduct promulgated

-11-

by city officials but to distinguish the injuries for which the government entity is responsible under § 1983 from those injuries for which the government should not be held accountable. *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1117 (6th Cir. 1994).

### 1.   Plaintiffs' Fourth Amendment Violation Claim

The Fourth Amendment to the U.S. Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . " U.S. Const. amend. IV. Defendants acknowledge that the destruction of property is a meaningful interference with an individual's property interests and is, therefore, considered a "seizure" under the Fourth Amendment. *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). However, in order to be actionable, the seizure must be unreasonable. *Soldal v. Cook*, 506 U.S. 56, 71 (1992). Reasonableness is a "predominantly objective inquiry." *City of Indianapolis v. Edmond*, 531 U.S. 32, 47 (2000). The reasonableness determination must reflect a careful balancing of governmental and private interests. *Soldal*, 506 US at 71.

There are two limited exceptions to the "objective standard for reasonableness" rule: special-need situations and administrative search cases where "actual motivations" do matter. *Ashcroft v. al-Kidd*, --- U.S. ----; 131 S. Ct. 2074, 2080-81 (2011) (citing *United States v. Knights*, 534 U.S. 112, 122 (2001)) (internal quotation marks omitted). A judicial warrant and probable cause are not needed where the search or seizure is justified by "special needs, beyond the normal need for law enforcement," such as the need to deter drug use in public schools, *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995) (internal quotation marks omitted), or the need to assure that railroad employees engaged in train operations are not under the influence of drugs or alcohol,

-12-

*Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602 (1989); and where the search or seizure is in execution of an administrative warrant authorizing, for example, an inspection of fire-damaged premises to determine the cause, *Michigan v. Clifford*, 464 U.S. 287, 294 (1984) (plurality opinion), or an inspection of residential premises to assure compliance with a housing code, *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 535-38 (l967).

### a.    Demolition of Plaintiffs' House

Defendants argue that in a non-law enforcement "special needs" context, such as the demolition of a dangerous building in this case, a warrant is not always necessary. Rather, the court must assess the reasonableness of the City's actions by balancing the governmental interest and the private interests at stake. Defendants contend that the City's Ordinance properly balances those interests by allowing demolitions without obtaining a demolition order only in limited situations where there is an immediate and serious danger to the public safety and thus meets Fourth Amendment scrutiny. Plaintiffs, however, contend that reliance on the Ordinance alone requires a higher level of scrutiny than objective reasonableness, but the legal authority offered does not appear to support this contention. Plaintiffs also contend that the Ordinance does not properly balance the relevant interests at stake because the City's enforcement policy lacks any protection for private property and the possessory interests at stake.

Under the "special needs" doctrine, the Supreme Court has recognized that a warrantless, suspicionless search may be justified "when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987). If a "special need" is identified, then the "reasonableness" of the search or seizure must be evaluated, balancing the gravity of the public interests, the degree to which the

-13-

intrusion advances the public interests, and the severity of the interference with individual liberty. *Illinois v. Lidster*, 540 U.S. 419, 426-27 (2004).The special-needs test is thus a more stringent test, adding a threshold step to the totality-of-the-circumstances test and requiring the court to first identify some "special need beyond the normal need for law enforcement" before undertaking a balancing of interests between the government's special need against the individual's privacy interests. *Wilson v. Collins*, 517 F.3d 421, 426 (6th Cir. 2008). Here, Defendants assert that Plaintiffs' house was inspected and demolished because city officials had determined that the deteriorating and exposed structure presented an immediate and serious danger to the public safety, and that the seizure was justified by the Ordinance which was passed to address the City's "special needs." *United States v. Carnes*, 309 F.3d 950, 960 (6th Cir. 2002) (emphasizing that where the government claims that special needs justified a search and seizure based on reasonable suspicion rather than probable cause, "a court must look to the 'actual motivations' of the individual officers"). There is no evidence that the proffered motivations are pretextual, even if, as Plaintiffs' suggest, their determination was incorrect. Plaintiffs also question whether anyone other than Crofoot witnessed children playing on the property or heard creaking in the house, but questioning confirmation of his observations is insufficient to establish pretext when Crofoot's determination that the house needed to be demolished was affirmed by Fire Marshal Barton. However, because the "special needs" test aims to balance the interests of law enforcement against privacy rights, and this case does not present an issue of law enforcement, the Court is hesitant to extend the special needs doctrine to what could be categorized as a "takings" case where no criminal conduct or administrative warrant is implicated.

Assuming the warrant requirement applies, Defendants argue that exigent circumstances provide an exception to the warrant requirement, even for searches and seizures inside a home which would otherwise be presumptively unreasonable. *See United States v. Rohrig*, 98 F.3d 1506, 1513 (6th Cir. 1996). Exigent circumstances are situations where real, immediate, and serious consequences will certainly occur if action is postponed to wait for a warrant. *United States v. Williams*, 354 F3d 497, 503 (6th Cir. 2003). The exigent circumstances exception relies on the premise that the existence of an emergency situation, demanding urgent action, may excuse the failure to procure a warrant. *United States v. Radka*, 904 F.2d 357, 361 (6th Cir. 1990); *see also Rohrig*, 98 F.3d at 1517 ("[T]he cases finding exigent circumstances uniformly cite the need for prompt action by government personnel, and conclude that delay to secure a warrant would be unacceptable under the circumstances.").

One recognized exigency is the "risk of danger" exigency which applies to situations involving the need to protect or preserve life or avoid serious injury either of police officers or of others. *Williams*, 354 F.3d at 503, 505. This usually applies where there are warrantless entries into buildings in cases where the state is acting in something other than a traditional law enforcement capacity. *Id.* at 503. For example, entry to a building to fight a fire does not require a warrant. See *Michigan v. Tyler*, 436 U.S. 499; 98 S Ct 1942 (1978). As the Sixth Circuit explained in *Rohrig*, 98 F.3d at 1516, the Supreme Court in *Camara v. Municipal Court*, 387 U.S. 523, 539 (1967), there is a limit to the cases holding that warrants are required for administrative searches, specifically in emergency situations. ("Since our holding emphasizes the controlling standard of reasonableness, nothing we say today is intended to foreclose prompt inspections, even without a warrant, that the law has traditionally upheld in emergency situations.").The *Camara* Court also made clear that "the

-15-

public interest demands that all dangerous conditions be prevented or abated." *Camara*, 387 U.S. at 537.

In reviewing whether exigent circumstances were present, the Court must consider the "totality of the circumstances and the inherent necessities of the situation at the time." *Rohrig*, 98 F.3d at 1511 (citation and quotation marks omitted). The relevant factors to be considered in determining whether "exigent circumstances" exist are (1) whether immediate government action was required, (2) whether the governmental interest was sufficiently compelling to justify a warrantless intrusion, and (3) whether the citizen's expectation of privacy was diminished in some way. *Rohrig*, 98 F.3d at 1521. In this case, Defendants contend that the City's Ordinance requires there to be exigent circumstances in the form of an "immediate and serious danger to the public safety" before the individual Defendants in this case were authorized to seize Plaintiffs' property through an emergency demolition. Thus, consistent with the exigent circumstances exception to the warrant requirement, Defendants argue that the Ordinance itself requires that there be a need for immediate government action before an emergency demolition take place.

The Ordinance also requires there be a compelling governmental interest in the form of a danger to the public safety and emergency personnel. In *Rohrig*, the police officers sought to restore the neighbor's peaceful enjoyment of their homes and neighborhood by entering the defendant's home for the purpose of locating and abating a nuisance. 98 F.3d at 1521. The court concluded that "the importance of preserving our communities" was not so insignificant that it could never serve as justification for a warrantless entry into a home, even if the absence of life-or death circumstances. *Id.* at 1521-22. In this case, Defendants assert that the governmental interest was significantly more compelling than in *Rohrig* because it involved the safety of the public and

-16-

emergency personnel. Although the Ordinance does not specifically address the third factor, Defendants note that courts have not required a diminished expectation of privacy before finding exigent circumstances to exist. Rather, that factor has been used as part of a balancing test such that exigent circumstances will more likely be found where the traditional privacy of the home has been compromised in some way. *Rohrig*, 98 F.3d at 1518. Defendants emphasize that this case does not involve the traditional privacy of the home. 1002 Webber was not Plaintiffs' residence. It was a rental property that had been vacant since late 2007 or early 2008. ECF No. 11 Ex. H at 27. Further, Plaintiff John Hescott was aware that the foundation wall had collapsed and was open to entry but left the home in that condition without taking any immediate action to prevent entry. Thus, Defendants contend that any expectation of privacy was significantly diminished.

Plaintiffs construe Defendants' argument as being that the Ordinance provides irrefutable proof that an exigent circumstance existed but contends that it is not "irrefutable proof" that exigent circumstances existed.  Plaintiffs also contend that some of the terms in the Ordinance such as "may lead to potential injury" do not require that any certain danger actually exist and invites unreasonable seizures of property that pose no real danger.  Additionally, because the Ordinance provides for demolition or repair of a property with a potential safety threat but provides no guidance to determine which procedure should be used, Plaintiffs argue that repair should be the reasonably chosen course of action. Without an order, consent or warrant authorizing an entry or seizure, "the government must shoulder the heavy burden of justifying any warrantless entry into a private home". *Rohrig*, 98 F.3rd at 1522.  Plaintiffs emphasize that the only evidence that the City has offered to satisfy its heavy burden that exigent circumstances justified its interference with the Plaintiffs' possessory rights is the language of its Ordinance. Plaintiffs also argue that the fact that

-17-

City officials followed the policy and directive of the ordinance is not irrefutable evidence that their actions were objectively reasonable. The deposition testimony of the City's employees demonstrates only that it was more expedient and cheaper to interfere with the Plaintiffs' possessory rights than take other less drastic  and available measures. ECF No. 18 Ex. G at 87-88, Ex. J at 15-16,79. Plaintiffs urge the Court to require the City to do more than rely on its Ordinance to rebut the presumption that their non-consensual entry was unreasonable.

Defendants reply that exigent circumstances do not require absolute certainty that harm will occur, but instead requires a risk of danger and a need for prompt action by government personnel such that delay to secure a warrant would be unacceptable under the circumstances. *Rohrig*, 98 F.3d at 1517. The City's Ordinance instructs government personnel that there must be an immediate potential for death or injury before determining that exigent circumstances justify taking a property through demolition. The standard for exigent circumstances is an objective one and asks whether the state actors had an objectively reasonable basis for believing that exigent circumstances existed. *Brigham City v. Stuart*, 547 U.S. 398, 398-99 (2006).  Defendants argue that here, the City officials objectively believed that there was an immediate risk of injury or death and that exigent circumstances existed for demolishing Plaintiffs' house.

Defendants note that the City's Ordinance makes clear that the Ordinance addresses only those situations where there is an immediate potential for injury, death, etc. It is the immediacy of the required action and the seriousness of the potential harm that justifies the warrantless seizure. The City's Ordinance requires a determination by a designated City official that there is a immediate risk of injury, death or spread of disease before an emergency demolition is authorized. Therefore, Defendants submit that the City's Ordinance does not violate the Fourth Amendment, and Plaintiffs'

-18-

Fourth Amendment claim against the City based on the July 18, 2009 demolition should be dismissed.

The Court concludes that exigent circumstances justified the emergency demolition. This requirement is reasonable and balances the governmental and private interests at stake. The City had no custom, policy, ordinance or regulation that was the "direct causal link" between the action taken by the individual Defendants' and the alleged deprivation of Fourth Amendment rights; if a Fourth Amendment violation occurred, it occurred because the individual Defendants acted in a manner inconsistent with the City's Ordinance by demolishing Plaintiffs' property in the absence of truly exigent circumstances. However, the City officials have articulated their objective belief that there was an immediate risk of injury or death to establish that exigent circumstances did exist to justify demolishing Plaintiffs' house. Moreover, Plaintiffs' expectation of privacy was diminished because the house was open to the public by virtue of the collapsed wall that Plaintiffs were aware of yet did not make repairs or otherwise close the residence off. The City is thus not responsible for a violation of the Fourth Amendment.

### b.    Removal of the Demolished Home and Its Contents

Plaintiffs request in their response that the Court grant summary judgment in their favor on the City's removal and disposal of the house and its effects and any other subsequent non-consensual and warrantless entries to grade the lot. *Michigan v. Tyler*, 436 U.S. 499, 509-11 (1978) (concluding that firefighters' subsequent warrantless entries after leaving the scene of the fire violated the Fourth Amendment); *Jacob v. West Bloomfield*, 531 F.3d 385, 392 (6th Cir. 2008) (noting that the government cannot invade a home's curtilage area without a warrant).  Because a party cannot request this type of relief in a response brief, Plaintiffs' request must be denied.

-19-

Defendants argue that the removal of the home and its contents  was not a separate Fourth Amendment violation because once the property was demolished there remained no protected privacy interest in the house and its contents. Under *Soldal v. Cook County*, 506 U.S. 56 (1992), however, seizures as opposed to searches do not implicate privacy interests. Defendants contend that Plaintiffs' property had already been effectively "seized" on July 18, 2009. The City's entry onto the property and later removal of the debris to the landfill was thus nothing more than a continuation of the same seizure. "Once the act of taking the property is complete, the seizure has ended and the Fourth Amendment no longer applies." *Fox v. Van Oosterum*, 176 F.3d 342, 351 (6th Cir. 1999). Moreover, even if removal of the debris pile containing the residents' personal property is considered a separate seizure, Defendants submit that it had, at most, a *de minimus* impact on any protected property interest such that the warrantless seizure was reasonable.  *United States v. Jackson*, 466 U.S. 109, 125 (1984).

The re-entry onto the property two days later to remove the debris, which included Plaintiff's contents, aluminum siding, wood, pipes, and other materials, constitutes a warrantless, non-consensual seizure that was not a continuation of the same initial seizure.   In *Jacobsen*, the Court noted that where the seizure was lawful at its inception but later the temporary deprivation of possessory interest is converted into a permanent one, the court is required to balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." 466 U.S. at 124-25 (concluding that the destruction of the powder during the course of the field test was reasonable because the interests justifying the procedure were substantial and the safeguards of a warrant would only minimally advance Fourth Amendment interests).  The initial deprivation had been completed, and despite the

-20-

fact that the house had been demolished, Defendants nonetheless re-entered Plaintiffs' property to remove what they characterize as debris, but what Plaintiffs considered valuable housing materials even in the demolished state. Summary judgment in Defendants' favor is not justified.

Plaintiffs also take issue with the warrantless entry onto Plaintiffs' land for the final grade and/or final grade inspection that took place in October 2009. Defendants contend that it is clear that there was no expectation of privacy at that time; the property was simply a pile of rubble and a vacant lot. Further, Defendants assert, Plaintiffs do not claim that any property was seized in October 2009. Plaintiffs do not advance any cases supporting the proposition that the mere entry onto land alone, where there was no search and no seizure, constitutes a Fourth Amendment violation. Moreover, Defendant emphasizes the curtilage case relied on by Plaintiffs, *Jacob v. Twp. of West Bloomfield*, 531 F.3d 385 (6th Cir. 2008), is inapposite. In *Jacob*, the defendants entered the plaintiff's property to inspect and determine whether the plaintiff remained out of compliance with a land use ordinance—the continuing violation of which involved the threat of criminal sanctions. The Court's finding of a Fourth Amendment violation was based upon the plaintiff's privacy interest. The Court explained that in determining whether a part of a home's curtilage is protected by the Fourth Amendment, the ultimate question is "whether the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *Jacob*, 531 F.3d at 389. The Court further found that the entry was akin to conducting a criminal investigation because of the criminal sanctions at issue. *Id* at 390-91.

In this case, by contrast, the October 2009 entry onto the property was neither an administrative nor a criminal search of the property. The grade inspection at the conclusion was necessary only to approve the payment of the contractors who performed the demolition. ECF No.

-21-

11 Ex. C at 75-76. It was not related to an administrative or criminal investigation. Further, as Defendants note, a vacant lot is not an area that harbors the intimate activity associated with the sanctity of a man's home and the privacies of life in order to provide Fourth Amendment protections if the entry is characterized as a search of the property.  Defendants' need to enter the property is insufficient to qualify as a Fourth Amendment search or seizure under the law because no dwelling remained and there was no search conducted.

### 2.  Plaintiff's Due Process Violation Claim

Defendants do not dispute that an official policy of the City in the form of the City's "Emergency Cases" section of the Dangerous Buildings Ordinance was the moving force behind the alleged injury in this case, i.e., the demolition of the house located at 1002 Webber. However, Defendants contend that the Due Process Clause was not implicated in this case because Plaintiffs have an adequate post-deprivation remedy in the form of their inverse condemnation action under state law.

The Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. As a general rule, the process that is due before the state may deprive an owner of property includes notice to the owner prior to the deprivation and an opportunity for a predeprivation hearing. *Harris v. City of Akron*, 20 F.3d 1396, 1401 (6th Cir. 1994). However, the Supreme Court has recognized an exception to this general rule where the situation necessitates quick action or makes efforts to provide meaningful pre-deprivation process impracticable, so long as the State provides adequate post-deprivation procedure. In some situations, a state may satisfy procedural due process by providing "some meaningful means by which to assess the propriety of the State's action at some

-22-

time after the initial taking." *Parratt v. Taylor*, 451 U.S. 527, 539 (1981). When the situation necessitates "quick action" by the state or makes efforts to provide a meaningful predeprivation process impracticable, the persons acting under state authority may proceed without violating the property owner's rights so long as the state provides an adequate postdeprivation procedure. Id. Such a procedure satisfies the "fundamental requirement of due process" of an opportunity to be heard "at a meaningful time and in a meaningful manner. Id. at 540 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

Under the rule in *Parratt*, as applied by *Harris*, *supra*, Defendants argue that the fact that the City did not provide Plaintiffs with prior notice and an opportunity for a pre-deprivation hearing is insufficient to establish a violation of due process because the State provides an adequate post-deprivation remedy. In *Harris*, the defendant city had a similar ordinance that allowed the demolition of dangerous buildings without notice in emergency situation. The plaintiff in *Harris* alleged that the defendants followed the procedure in the city code but in their haste to demolish his building, they found an emergency when none actually existed, and thus followed the wrong procedure. *Harris*, 20 F.3d at 1403. Like the City's ordinance in this case, the ordinance at issue in *Harris* required notice and an opportunity to be heard in non-emergency situations. *Id.* The Sixth Circuit concluded that use of the emergency procedure without prior notice to the owner did not violate due process because the state provided a meaningful post-deprivation process. *Id.* at 1404-05. In so holding, the Court found that it was immaterial whether the city was actually correct in determining that an emergency existed before demolishing the building. *Id.* at 1404. Because of the threat to public safety and the fact that "the state provided a meaningful postdeprivation process to determine the propriety of the demolition decision," the requirements of due process were satisfied.

-23-

*Id.* at 1404-05. The post-deprivation process provided by the State in *Harris* was a state law claim for inverse condemnation. *Id.* at 1401.

Defendants note that in *Furman v. City of Detroit*, 1 F. Supp. 2d 665, 674 (E.D. Mich. 1998), the Court acknowledged the conclusion from *Parratt* that, in some cases, "either the necessity of quick action by the State or the impracticability of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of due process." (Citation and quotation omitted). However, in *Furman*, unlike this case, there was no claim of emergency or impracticability. Rather, the defendant city in *Furman* demolished the building after sending notices of hearings and/or demolition by certified mail to a vacant address with knowledge of the property owner's current address and without having received any receipts acknowledging receipt of the notices. *Id.* at 669.[2]

Here, the City's Ordinance only allows for emergency demolitions without notice or hearing in cases where there is an "immediate and serious danger to the public safety." ECF No. 11 Ex. E §151.120. In non-emergency situations, the Ordinance requires notice and hearing before demolitions take place. ECF No. 11 Ex. E §§ 151.113 to 151.118. Defendants emphasize that when an immediate and serious danger to the public safety exists, quick action is required and it is not practical to wait for a pre-deprivation process to run its course. In this case, the City demolished the property on the same day it had notice of the danger. Under the holding of *Harris*, *supra*, Defendants

---

[2] Defendants also provide a case from the Second Circuit, *Catanzaro v. Weiden*, 188 F.3d 56, 62-63 (2d Cir. 1999), concluding that the holding in *Harris* extends further and finding that "where the emergency procedure itself is not challenged on a constitutional basis, the question of whether or not the official made the correct decision in invoking that procedure is not of constitutional significance."

-24-

argue that Plaintiffs cannot establish a due process violation simply by contending that the City was incorrect in determining that an emergency was present and demolition was necessary. Like in *Harris*, "[a]n erroneous determination that no emergency existed would have resulted in the very threat to the public that the code was intended to prevent" and "[f]ollowing the nonemergency procedures of [the Ordinance] would have left the emergency untreated and the public exposed to the resulting danger." *Harris*, 20 F.3d at 1404.

Plaintiffs clarify that their due process claim is based on the City's failure to provide them with either pre or post deprivation notice or a meaningful opportunity to be heard—not that the City failed to compensate them for the destruction of their property. Plaintiffs emphasize that their right to due process is distinct from their right to just compensation under the Michigan Constitution.

An inverse condemnation claim arises directly from the self-executing character of the Just Compensation Clause. *First English Evangelical Lutheran Church v. Glendale*, 482 U.S. 304, 315-16 (1987). The existence of a state inverse condemnation remedy renders unripe a regulatory takings claim under the Fifth Amendment's Just Compensation Clause because of the nature of the constitutional right. *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 194-95 (1985). The Just Compensation Clause does not proscribe the taking of property but only uncompensated takings. *Id*. at 193, 195 n. 134 (relying on a self-described "imperfect" analogy to *Parratt v. Taylor*, 451 U.S. 527 (1981) for the plaintiff's second ripeness test). The analogy to *Parratt* was imperfect because that case did not apply to situations "in which the deprivation of property is effected pursuant to an established state policy or procedure, and the State could provide pre-deprivation process. Unlike the Due Process Clause, however, the Just Compensation Clause has never been held to require pre-taking process or compensation." *Williamson*, 473 U.S. at 195

-25-

& n. 14. The Court explained that "[t]he nature of the constitutional right, therefore, requires that a property owner utilize procedures for obtaining compensation before bringing a § 1983 action." *Id*. at 195, n. 13. In other words, a plaintiff could not establish for § 1983 purposes the violation of the federal constitutional right to just compensation unless no right to, or adequate procedure for, obtaining just compensation for regulatory takings existed under state law.

Plaintiffs contend, however, that the existence of an inverse condemnation claim does not obviate a due process claim. *Lingle v. Chevron*, 544 U.S. 528, 543 (2005), held in relevant part that the payment of just compensation could not obviate a due process violation. *Id.* (concluding that no amount of compensation can authorize an arbitrary or unreasonable deprivation of property). If the government fails to afford the requisite due process procedures, there is no self-executing right to compensation under the Due Process Clause. In contrast, Section 1983 provides the compensatory remedy for due process deprivations. *See e.g.*, *San Diego Gas & Electric Co v. San Diego*, 450 U.S. 621, 658 n. 23 (1981) (Brennan, J., dissenting) (Section 1983 provides a cause of action for damages when application of a regulation violates the Due Process rather than the Just Compensation clause).

Plaintiffs submit that their state inverse condemnation claim, which is asserted only under the state constitution, does not subsume the Plaintiffs' federal due process claim. In *Soldal*, *supra*, the Supreme Court rejected the notion that the Due Process Clause provided the only remedy for the seizure in that case. The Court concluded that there was no basis for "doling out constitutional protections in such fashion. Certain wrongs effect more than a single right and, accordingly, can implicate more than one of the Constitution's commands." 506 U.S. at 70. When such multiple violations are alleged, the Court advised not to identify, as a preliminary matter, the claims "dominant" character but to examine each constitutional provision in turn. *Id.* at 70.

Plaintiffs note that the City relied on *Harris v. City of Akron*, 20 F.3d 1396 (6th Cir. 1994) for the proposition that an inverse condemnation claim could remedy a due process violation but contend this reliance is erroneous. In *Kruse v. Village of Grand Falls*, 74 F.3rd 694, 699 (6th Cir. 1996) the court explained that its statement in *Harris* regarding the availability of an inverse condemnation remedy was dicta because the plaintiff had voluntarily dismissed its Just Compensation Clause taking claim. Moreover, *Lingle* and not the earlier decided *Harris* is the controlling authority on the issue.

Additionally, Plaintiffs believe that the City wrongly construes *Jones v. Powell*, 462 Mich. 329 (2000), which instead demonstrates that Michigan provides no adequate post deprivation remedy for Federal or State due process violations. The court in *Jones* did not hold that a citizen cannot state a claim for a due process violation under the Michigan Constitution but instead concluded that it would not infer a cause of action for a damage remedy against municipalities or their employees under the State Constitution's Due Process Clause because Section 1983 provided an adequate remedy. *Id.* at 335-36. The court explained that it had only inferred such a compensatory remedy under the State Constitution when no other remedy, such as an Section 1983 claim, existed. *Id.* at 333. Plaintiffs believe that the correct conclusion, based on the holding in *Jones*, is that they have no compensation remedy for Federal Due Process violations under State law and therefore Section 1983 provides the only compensatory remedy for a Federal Due Process violation. Defendants instead interpret *Jones* as concluding that a plaintiff is unable to pursue a due process violation where a state inverse condemnation remedy is available under the Michigan Constitution, which Plaintiffs contend is incorrect.

-27-

Plaintiffs are not suggesting that the City must provide pre-deprivation notice and hearing when truly exigent circumstances exist. Plaintiffs' position is that the City should provide pre-deprivation notice if feasible and must provide full post-deprivation process. "[S]ummary administrative action may be justified in some emergency situations" even if the act deprives a person of a substantial property interest. *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 299-300 (1981).  In *Hodel*, the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1201 et seq. (1976 ed. Supp. III), permitted the Secretary of the Interior to issue an emergency cessation order without a prior hearing when an urgent situation as defined under the Act existed. The court held that the Act's emergency cessation orders did not violate the Due Process Clause because the statutory scheme provided property owners with "prompt and adequate" post-deprivation review to challenge the order. *Id.* at 303. The Court held that the relevant question was not whether the immediate cessation order should have been issued "but whether the statutory procedure itself is incapable of affording due process." *Id.* at 302.

In *Flatford. supra*, the plaintiff sued the city and other officials after an emergency eviction from a rental unit. The issue in the building official's interlocutory immunity appeal was whether the building official was liable for damages under Section 1983 because the official failed to provide the plaintiff with "any process before or after the eviction." *Id.* at 167. The court first held that the *Parratt* "adequate state remedy" rule that applies to random and unauthorized acts did not apply when officials act according to established procedures. When officials act according to established procedures, the governing body can anticipate that those procedures could result in the deprivation of rights that the due process clause protects. *Id.* at 168. Moreover, even if exigent circumstances could relieve a municipality from providing predeprivation process, such circumstances do not

-28-

relieve the municipality from providing meaningful post-deprivation process. *Id.* at 169. The

*Flatford* court reasoned:

> The requirement of an immediate and meaningful post deprivation process becomes even more important in view of the license which qualified immunity essentially allows public officials when they make judgments affecting the health and safety of our citizens under perceived exigent circumstances. Even though we recognize that these judgments may be mistaken, the opportunity of an administrative hearing assures that fairness will quickly prevail and the constitutional rights, if mistakenly curtailed, will be immediately restored. Without the assurance of immediate review, qualified immunity may be wrongly  perceived as an open invitation for public officials to ignore fundamental rights without any fear of censure. This is most certainly not our intended message

*Id.*

In this case, Plaintiffs argue that the City could have anticipated that it might destroy property without providing any pre-deprivation notice or hearing. Even if an emergency existed that prevented the City from providing any notice or hearing before demolishing the Plaintiffs' house and disposing of its contents, that did not relieve the City from providing a "prompt and adequate" post-deprivation hearing from which the Plaintiffs could have sought judicial review. *See Hodel*, *supra*, at 303. Thus, the City's policy itself violates the Due Process Clause because it fails to provide any procedural protections either before or after the predictable deprivation of property rights.

The City has a pre-deprivation process that permits a citizen to contest the validity of a determination that demolition is required. Ordinance Section 151.114, Notice and Order to Show Cause; ECF No. 18 Ex. J at 12-15. Plaintiffs believe that the City has not adequately explained why it does not provide a similar post deprivation hearing when an alleged emergency prevents prior review of the demolition order. According to John Stemple, the Chief Inspector, the City did not hold many such pre-deprivation hearings because of the expense. *Id.* at 15. Even if a house violated

-29-

code, the City would not issue a notice to show cause why a house should not be demolished if the City had no general budget funds for the demolition. *Id.* at 15-16.

Plaintiffs assert that the timeline establishes that pre-deprivation notice was not impossible or impractical. Barton and Crofoot had approximately a three-hour window to call Plaintiffs and advise them that they intended to demolish the house. Crofoot testified that he could not call Plaintiffs, not because there was no time, but because it was a Saturday, the records office was closed, and it is not City policy to make a phone call in that situation. ECF No. 18 Ex. G at 88. Moreover, he testified that even if he had time in an emergency demolition, he would not call a property owner because it is not the City's policy to make such calls either before or after an emergency demolition. *Id.* at 38, 88-89, 91. Crofoot also testified that the City does not give any person post-deprivation notice because of time constraints. *Id.* at 38-39. He testified that he has no time because he "has to get other files done, so they can be released for demolition; or I will lose the [grant] money." *Id.* at 38-39. The City, moreover, would not have provided any pre-deprivation notice even if it were possible because it is not City policy to provide pre- or post deprivation notice in "emergency" demolition situations. The City's objectively unreasonable policies, Plaintiffs argue, cannot protect it or the individual actors from liability because the City's policy reflects a willful and deliberate disregard for its citizens' constitutionally protected property rights.

Plaintiffs also note that there are substantial factual dissimilarities between this case and *Harris*, *supra*, but that the dispositive difference is that the Plaintiffs are challenging the validity of the emergency demolition procedure itself. The *Harris* court held that the plaintiff did not have a viable procedural due process claim because Plaintiff did not attack "the constitutionality of code section 190.705 for lack of standards or otherwise. Thus, he accepts the authority of this official to

make the determination, but questions the correctness of his judgment." *Id.* at 1403-04; *see also Fruman v. City of Detroit*, 1 F. Supp. 2d 665, 673 (E. D. Mich. 1998) (A plaintiff whose property the municipality has demolished without notice can establish a due process violation when that person can show that "the procedure afforded by the governmental policy itself deprived him of due process."). Additionally, Plaintiffs find the City's contention that its ordinance is similar to the *Harris* ordinance incorrect. The *Harris* ordinance provided that if the superintendent opined that there was "an actual and immediate danger of failure or collapse" of the building that would endanger life or property he must make the building temporarily safe. If the building was "in such a state of decay  that it was impracticable to be repaired" he could order the building or structure razed or demolished. *Harris*, *supra*, at 1398. The *Harris* court's analysis was informed by the plain terms of the ordinance that authorized demolition based upon the superintendent's opinion that the building could not be saved. It also required the superintendent to find that an actual and immediate danger existed. In contrast, the Saginaw ordinance requires only that there be a potential for an immediate danger and  does not require that the City order demolition as a last resort.  The two ordinances therefore are different.  Plaintiffs request that the Court deny Defendants' motion for summary judgment as a result.

Defendants clarify that they have not argued that the availability of a state law inverse condemnation action bars or substitutes for an action for a due process violation but instead argue that there is no due process violation at all. Where, as here, the emergent nature of the danger required "quick action" such that pre-deprivation process was not practicable, the *Parratt* rule provides that state actors may proceed without violating due process rights so long as the state provides an adequate post-deprivation procedure. *See Parratt v. Taylor*, 451 U.S. 527, 539 (1981);

*Harris v. City of Akron*, 20 F.3d 1396, 1404-05 (6th Cir. 1994). Defendants' argument is that the availability of a state law inverse condemnation action constitutes adequate post-deprivation process such that there is no due process violation. Additionally, they argue there is no support for Plaintiffs' contention that the only means of providing meaningful post-deprivation process would be for the Ordinance itself to provide for a post-demolition administrative hearing. In fact, no such procedure was provided by the Ordinance at issue in *Harris*, *supra*. An inverse condemnation action will provide Plaintiffs with the same opportunity to be heard on the issue of whether the demolition was proper and, if determined that it was not proper, will provide compensation for their injury. A post-deprivation hearing under the Ordinance would do no more than that.

Defendants distinguish *J.C. Flatford v. City of Monroe*, 17 F.3d 162 (6th Cir. 1994), from the instant case because *Flatford* found that a postdeprivation administrative hearing was required to satisfy due process in the context of an emergency evacuation of citizens from their homes. The Court concluded that post-deprivation tort remedies were not timely or sufficient based on the balancing test set forth in *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976). Important to the Court's analysis in *Flatford* was that the deprivation involved displacing citizens from their homes. *Flatford*, 17 F.3d at 169. Thus, Defendants argue that the interest at issue in *Flatford* was of greater gravity than the interest at issue in this case where Plaintiffs did not reside in the property that was demolished. Rather, the property was a long vacant, rental property. Unlike the *Flatford* case where the post-deprivation process would have determined when/if the plaintiffs were able to return to their home, there was no similar need for immediate post-deprivation process here. The property had already been demolished.

Further, Defendants contend that the Sixth Circuit in *Kruse*, *supra*, did not find the *Harris* Court's holding that due process was satisfied by the state's provision of "meaningful post-deprivation process [of a state law inverse condemnation action] to determine the propriety of the demolition decision" was dicta. The *Kruse c*ourt's statement regarding dicta was in reference to the Fifth Amendment "takings" claim in *Harris*—a separate claim that was dismissed by the Court without a decision on the merits. The *Kruse* court concluded that the *Harris* court's statement regarding the prerequisites for a Fifth Amendment "takings" claim, not the due process claim, was dicta. *See Kruse*, 74 F.3d at 699. Plaintiffs also attempt to distinguish *Harris*, *supra*, because the plaintiff in *Harris* did not challenge the ordinance itself, as Plaintiffs do here. While it is not entirely clear how, if at all, the failure to challenge the ordinance would have changed the Court's analysis, it appears that, at most, a challenge to the ordinance would have allowed the plaintiff to claim that the facts did not constitute a situation requiring quick action instead of assuming that quick action was necessary. 20 F.3d at 1405.

Defendants also emphasize that in *Catanzaro v. Weiden*, 188 F.3d 56, 63 (2d Cir. 1999), the Court found that, even assuming the plaintiffs' claim that the building remained structurally sound to be true, the plaintiffs had not produced evidence sufficient to find that the defendant acted arbitrarily or otherwise abused his discretion in deciding to invoke the emergency procedure. In so holding, the Court noted that the event that precipitated the demolition was an automobile accident in no way attributable to the defendants. The defendants merely reacted to an incident which was beyond their control. *Id.* Similarly, in this case, the damage to Plaintiffs' building was not caused by the City, and the City officials merely reacted to the situation upon receipt of the Central Dispatch call. There is no evidence from which a jury could conclude that the individual Defendants

-33-

did not reasonably believe that an emergency in fact existed. Under these facts, the Defendants' invocation of the emergency provisions of the City's Ordinance was not arbitrary and did not amount to an abuse of discretion.

Defendants argue that the alleged availability of less drastic measures to protect the public is also unavailing. The Court in *WWBITV, Inc. v. Village of Rouses Point*, 589 F.3d 46, 51 (2d Cir. 2009), found that even if the plaintiffs raised valid questions about whether the Village chose the best possible method of safeguarding the public, such a showing was not sufficient to defeat summary judgment, explaining that "such hindsight analysis of a municipality's means of dealing with an emergency would encourage delay and risk increasing the public's exposure to dangerous conditions." *WWBITV*, 589 F.3d at 52. Plaintiffs also again take issue with the use of "may" and "potential" in the Ordinance, but the use of similar terms have passed due process scrutiny. For example, in *Hodel*, 452 U.S. at 301, a case cited by Plaintiffs, the Surface Mining Control and Reclamation Act was found to provide sufficient criteria for the issuance of summary cessation orders where it defined the threat of "imminent danger to the health and safety of the public" as the existence of a condition or practice which "could reasonably be expected to cause substantial physical harm." *See* 30 U.S.C. §1291(8). Defendants request that the Court grant their motion for summary judgment on Plaintiffs procedural due process claim because pre-deprivation notice was not feasible nor required, and the City's lack of post-deprivation notice does not constitute an independent due process violation because Plaintiffs have an adequate remedy through a state-law inverse condemnation proceeding.

Based on the authority advanced, a due process violation did not occur because of the availability of the post-deprivation remedy of an inverse condemnation claim results. Although the

City *could* have provided a hearing in a more timely fashion than an inverse condemnation claim would provide, the ultimate result would be identical and the destruction of the building removes the urgency to provide an immediate post-deprivation hearing. Additionally, there is no evidence that Defendants did not reasonably believe that an emergency existed such that the lack of pre-deprivation notice was a constitutional violation even if there arguably was time to notify Plaintiffs of the demolition. Defendants' motion for summary judgment on this claim will thus be granted.

### 3.   Plaintiffs' Substantive Due Process Claim Against the City

Count II of Plaintiffs' Complaint alleges that the City's Ordinance violates the substantive component of the due process clause, which Plaintiffs allege limits the City's power to enact ordinances that interfere with or destroy protected property rights. Plaintiffs challenge the ordinance on a number of grounds, including that it: (a) fails to articulate clear and workable standards to guide the discretion of the officials charged with its implementation; (b) fails to provide even minimal due process such as requiring that officials attempt to contact owners by telephone before destroying property; (c) fails to require decisionmakers to make a good faith and informed effort to take less drastic measures than destroying property; (d) fails to provide any post-deprivation notice or hearing in the event of a true emergency; and (e) fails to require the City to account for any personal goods or property destroyed or taken coincident with the emergency demolition.

There are generally two types of substantive due process violations: (1) official acts that are unreasonable and arbitrary and may not take place no matter what procedural protection accompany them; and (2) official conduct that "shocks the conscience." *Harris*, 20 F.3d at 1405. Making a faulty or incorrect decision alone is not enough to meet this standard. *Id.* A statute or a municipal ordinance is arbitrary and capricious and, hence, is constitutionally invalid as transgressing due

process requirements if it fails to advance a legitimate governmental interest or if it is an unreasonable means of advancing a legitimate governmental interest; however, if any conceivable legitimate governmental interest supports the ordinance, that measure is not arbitrary and capricious and, hence, cannot offend substantive due process norms. *37712, Inc. v. Ohio Dep't of Liquor Control*, 113 F.3d 614, 619-20 (6th Cir. 1997). In this case, Defendants assert that the City's Ordinance advances the legitimate governmental interest of protecting the public and emergency personnel from immediate and serious dangers caused by dangerous buildings. The City is allowed to act without notice and hearing only in emergency cases where requiring the City to provide notice and hearing would effectively eliminate the City's ability to act quickly to protect the public. Defendants argue that the Ordinance is thus not arbitrary and capricious and, therefore, does not violate substantive due process.

Similarly, Defendants do not believe that the Ordinance shocks the conscience. The Ordinance provides governmental officials with the authority to demolish property only "where there is evidence of an immediate and serious danger to the public safety or health" defined in the Ordinance to mean "[s]ituations which may lead to the immediate potential for injury, death, spread of disease or infection, or for property or structural damage" or where there is "[t]he potential for harm to emergency personnel who may have to re-enter such structures in the course of their duties." ECF No. 11 Ex. E, § 151.120. Defendants submit that the Ordinance advances important governmental interests and is limited in scope such that it does not shock the conscience.

Defendants are unsure if Plaintiffs' Count II is also challenging the Defendants' actions under the Ordinance as part of their substantive due process, but contend that even if such an assertion is being made, no substantive due process violation occurred. The Sixth Circuit's rationale

in *Harris* is equally helpful here:

> Harris offered no evidence in support of his claim that any of the officials acted arbitrarily and unreasonably, or in bad faith. At most the proffered evidence pointed to a faulty decision made in haste. The code gave these officials the authority to demolish a building found to be a threat to public safety or health and the plaintiff produced no proof that they abused that power.
>
> So far as we know, or have been informed, no court has held that it shocks the conscience for municipal authorities, acting pursuant to an unchallenged ordinance, to order the destruction of a building found by responsible officers to be a nuisance or a threat to public health or safety. Although perhaps the defendants could have made further inquiries concerning the condition of the building, their deposition testimony makes clear that they acted on the basis of their observations and training. The district court properly granted summary judgment on the substantive due process claim.

20 F.3d at 1405. Similarly, in this case, there is no evidence of arbitrary or unreasonable actions in this case. The individual Defendants contend they acted reasonably based upon the information available to them and pursuant to the authority granted by the Ordinance. *See also, Catanzaro*, 188 F.3d at 64 (where there was no evidence to suggest that the defendants' actions were anything worse than incorrect or ill-advised, the Second Circuit found no violation of substantive due process; the defendants did nothing more than order the demolition of a building, which was severely damaged by an automobile accident, in order to protect the public safety).

Plaintiffs response emphasizes several points of disagreement with the City's substantive due process arguments. First, Plaintiffs contend that the "shocks the conscience" standard of municipal liability does not apply to legislative enactments but only applies to executive action. *County of Sacramento v. Lewis*, 523 U. S. 833, 846 (1998). Plaintiffs note that because they have not challenged executive action on substantive due process grounds, the "shocks the conscience" standard does not apply. Plaintiffs submit that the proper inquiry is whether the officials acted in a reasonably objective manner, i.e. and not arbitrarily and capriciously. The Fourteenth Amendment's

Due Process Clause has a substantive component that "[bars] certain government actions regardless of the fairness of the procedures used to implement them," *Daniels v. Williams*, 474 U.S. 327, 331 (1986). A police power ordinance can transgress the substantive component of the Due Process Clause if it either lacks a legitimate police power purpose or constitutes an unreasonable means of advancing an otherwise legitimate governmental goal. *Lawton v. Steele*, 152 U.S. 133, 137 (1894) (the means used "must be reasonably necessary for the accomplishment of [an otherwise legitimate] purpose, and not unduly oppressive upon individuals."). Plaintiffs submit that the City's procedures constitute an unreasonable means to further any legitimate purpose of the ordinance.

Even if emergency demolitions without notice might be necessary in some situations, Plaintiffs argue that the City's ordinance is unduly oppressive. It permits the ex parte demolition of property without actual exigent circumstances and without any kind of post- deprivation notice or hearing to contest the ex parte demolition order. The ordinance in *Harris*, *supra*, demonstrates that without compromising public safety, the city can require that demolition authorities first find whether the building can be made safe temporarily before undertaking the drastic action of demolishing the property. Plaintiffs offer two state law cases to support their argument, but provide no federal authority to support their contention.

In reply, Defendants note that Plaintiffs focus their substantive due process argument on the alleged procedural deficiencies of the Ordinance. Rather, the question is whether the Ordinance fails to advance a legitimate governmental interest or if it is an unreasonable means of advancing a legitimate governmental interest. *37712, Inc. v. Ohio Dep't of Liquor Control*, 113 F.3d 614, 619-20 (6th Cir 1997). If any conceivable legitimate governmental interest supports the Ordinance, that measure is not arbitrary and capricious and, hence, cannot offend substantive due process norms.

*Id.* Otherwise stated, substantive due process requires only that the City demonstrate that its scheme is rationally related to the asserted legitimate governmental purpose. *See Mansfield Apartment Owners Ass 'n v. City of Mansfield*, 988 F.2d 1469, 1477 (6th Cir 1993). To meet the rational basis standard the Ordinance need only have some reasonable basis. *See id.*

"An ordinance which represents an exercise of the municipality's police powers is presumed to be constitutionally valid, with the burden of showing unreasonableness being cast upon those who challenge the ordinance." *Curto v. City of Harper Woods*, 954 F.2d 1237, 1242 (6th Cir. 1992). In this case, Defendants submit that the City's Ordinance advances the legitimate governmental interest of protecting the public and emergency personnel from immediate and serious dangers caused by dangerous buildings. Further, the Ordinance is not an unreasonable means of advancing this legitimate governmental interest. As discussed above, the City is allowed to act without notice and hearing only in emergency cases where there is an immediate and serious danger to the public safety. Plaintiffs have cited no federal substantive due process authority supporting their claim that substantive due process is violated simply because alternate means of advancing the government's interest can be conceived.

Plaintiffs' state law citations also do not support their substantive due process claim. *Childs v. Anderson*, 344 Mich. 90 (1955), did not involve a constitutional challenge to the statute at issue, nor did it involve an emergency demolition. The Court in *Childs* simply modified the lower court's order that the property be razed to give the owner an opportunity to abate the fire hazard. Similarly, Plaintiffs' reliance on *City of Saginaw v. Budd*, 381 Mich. 173 (1968), where a different ordinance with different language was found to be unconstitutional as an improper delegation of authority without definable standards, is inapposite. As discussed above, the emergency Ordinance at issue

-39-

in this case only applies where there is an immediate and serious danger to the public safety. Unlike the ordinance at issue in *Budd*, it does not authorize demolition based simply on "inadequate, maintenance, dilapidation."

The City's Ordinance is rationally related to a legitimate government interest and is not an unreasonable means of achieving that interest. The fact that the City's interest could be achieved by alternate means such as repairing the property or fencing off the area does not render their current policy of demolishing a building that is a threat to public safety a substantive due process violation. Defendants' motion for summary judgment on this claim will be granted.

### B.   Plaintiffs' Federal Claims Against the Individual Defendants

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether a governmental official is entitled to qualified immunity, the Court must look at the objective reasonableness of the official's conduct in relation to clearly established law. *Id.* There are limited circumstances when a governmental official is not entitled to this immunity. There circumstances are when (1) "the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred;" (2) "the violation involved a clearly established constitutional right of which a reasonable person would have known;" and (3) "the plaintiff has offered sufficient evidence 'to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.' " *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (quoting *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc)). The Court need not determine each of these elements in that order, as the Court

can conclude that an official is entitled to qualified immunity without determining whether a constitutional violation has actually occurred. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

For a right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). The question is whether the defendants had "fair warning" that their actions were unconstitutional. *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005). The burden of convincing the Court that the law was clearly established rests squarely on the plaintiff. *Cope v. Heltsley*, 128 F.3d 452, 459 (6th Cir. 1997).

An official can be on notice that their conduct violates a "clearly established" constitutional right (1) where "the violation was sufficiently 'obvious' under the general standards of constitutional care that the plaintiff need not show 'a body' of 'materially similar' case law", or (2) where "the violation is shown by the failure to adhere to a 'particularized' body of precedent that 'squarely govern[s] the case.'" *Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir. 2005) (quoting *Brosseau v. Haugen*, 543 US 194, 199-200 (2004) (reaffirming that the inquiry into whether an officer violated a "clearly established" right "must be undertaken in light of the specific context of the case, not as a broad general proposition.").

### 1. Plaintiffs' Fourth Amendment Claims Against the Individual Defendants

A seizure does not offend due process unless it was objectively unreasonable in light of the governmental and private interests at stake. *See Soldal*, 506 U.S. at 71. The Sixth Circuit has not directly addressed the circumstances under which an emergency demolition to protect the public safety is reasonable such that it would be permissible under the Fourth Amendment. The Sixth Circuit upheld a warrantless entry into a home to abate a public nuisance in *Rohrig*, *supra*, but in

so doing did not outline the circumstances under which a seizure to abate a public nuisance would be permissible. Some Circuits have recognized a nuisance abatement exception to the warrant requirement provided procedural due process standards are satisfied. *See, e.g.*, *Samuels v. Meriwether*, 94 F3d 1163, 1168 (8th Cir. 1996); *Santana v. City of Tulsa*, 359 F.3d 1241, 1245 (10th Cir. 2004); *Freeman v. City of Dallas*, 242 F.3d 642, 652-53 (5th Cir. 2001). The Sixth Circuit has not followed that line of cases and the law is thus not clearly established in the Sixth Circuit as to the Fourth Amendment requirements for demolition of a vacant, rental property where there is alleged to be a serious and immediate danger to the public safety. Therefore, the individual Defendants contend they are entitled to qualified immunity.

Even if the general warrant requirement applies, warrantless searches and seizures are not unreasonable where exigent circumstances exist. *See Rohrig*, 98 F.3d at 1513. For purposes of determining whether qualified immunity applies, "[t]he relevant inquiry is whether the facts are such that an objectively reasonable officer confronted with the same circumstances could reasonably believe that exigent circumstances existed." *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002). The objective legal reasonableness of an individual decision is to be determined on a case-by-case basis. *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 999 (6th Cir. 1994). The Supreme Court has recognized that "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present." *Anderson*, 483 U.S. at 641. In such cases, "those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable." *Id.* "The same is true of their conclusions regarding exigent circumstances." *Id.* In this case, Defendants contend that the law was clearly established that warrantless searches and seizures do not violate the Fourth Amendment where exigent

-42-

circumstances exist and the facts establish that an objectively reasonable governmental officer confronted with the same circumstances would believe that exigent circumstances existed.

The events at issue in this case began with a 911 call which resulted in Officer Wenger being dispatched to 1002 Webber. When checking the premises, Officer Wenger noticed the collapsed foundation wall and was immediately concerned about a possible safety hazard which prompted him to contact code enforcement. John Stemple was contacted by Central Dispatch and, being out of town, he directed Scott Crofoot to go to the scene. When Crofoot reported the condition of the property, including the fact that the foundation wall had collapsed and that the house had shifted, Stemple directed Crofoot to contact the Fire Marshal, Greg Barton, to also come to the scene.

Crofoot and Barton entered the premises and discovered additional structural problems in the form of deteriorated posts, a cracked and rotted support beam, deflection of the wall above the collapsed foundation and a second basement wall that was deflecting. The house was also creaking in the slight wind present that day. Based on their observations, Crofoot and Barton believed that the house was in imminent danger of collapse. Crofoot had escorted children off the porch upon his arrival and the house was open to entry through the basement. Faced with these circumstances, Defendants argue that an objectively reasonable governmental officer in their position could have similarly determined that immediate action was necessary to protect the public safety. There is no evidence that Crofoot and Barton fabricated reasons for the demolition, and Crofoot took photographs in support of his observations and documented his primary findings in his notes. ECF No. 11 Exs. F and L.

The individual Defendants assert that they were also acting pursuant to authority provided to them by the City's Ordinance. The enactment of a law forecloses speculation by enforcement

-43-

officers concerning its constitutionality-with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws. *Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979) (noting that "[s]ociety would be ill-served if its police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement."). In light of the long-recognized "exigent circumstances" exception to the warrant requirement, Defendants submit that there is no basis to conclude that the City's Ordinance was "so grossly and flagrantly unconstitutional that any person of reasonable prudence" would be bound to see its alleged flaws. The City's Ordinance only allows for emergency demolitions in cases of an immediate and serious danger to public safety and, thus, would appear consistent with the Fourth Amendment to a reasonable governmental official charged with following it. The Individual Defendants thus request that they be granted qualified immunity on Plaintiffs' Fourth Amendment claim against them.

Plaintiffs provide several general arguments regarding their Fourth Amendment claim but the arguments are directed at the City's liability and not at the Individual Defendants' liability. Plaintiffs have not provided any legal authority for the proposition that the law was clearly established with regard to the application of the Fourth Amendment to emergency demolitions. Indeed, there are no Sixth Circuit or Supreme Court cases directly addressing the exigent circumstances necessary for the warrantless demolition of a dangerous building. In light of *Tyler* and *Rohrig*, *supra*, and the exigent circumstances exception to the warrant requirement, Defendants contend that reasonable city officials presented with the facts at issue in this case would have had grounds to believe that the immediate danger of collapse of a building that was open to trespass in a residential neighborhood constituted an exigency of sufficient proportions to render a warrantless

demolition reasonable. Further, and contrary to Plaintiffs' suggestion, the demolition decision was not based only upon the fact that the house was open to trespass but, rather, upon the fact that the house was in imminent danger of collapse *and* was also open to trespass. The concern expressed by Barton regarding the accessibility of the house was that persons could go into the house through the collapsed basement wall and be trapped inside when the house collapsed. ECF No. 11 Ex. D at 25. Similarly, Crofoot was concerned about the danger to children in the neighborhood in the event of collapse, because there were kids on the porch of the house when he arrived. ECF No. 11 Ex. C at 43, 85. Consequently, the individual Defendants request that the Court conclude that they are entitled to qualified immunity.

Defendants' motion for summary judgment on Plaintiffs' Fourth Amendment claims against the Individual Defendants related to the July 18, 2009 demolition will be granted because they did not violate Plaintiffs' clearly established constitutional rights and the actions of the Individual Defendants were otherwise reasonable under established Fourth Amendment rights.

Plaintiffs also similarly argue that no exigent circumstances justified the Individual Defendants re-entering the property on July 20, 2009 to remove what remained of Plaintiffs' house and no exigent circumstances to justify the subsequent warrantless entry to grade and inspect the property. The responsible government officials therefore violated the Plaintiffs' 4th Amendment rights to be free from unreasonable seizures.

Since *Soldal*, *supra*, at 68-70, it has been established that an interference with a citizen's possessory rights can violate the Fourth Amendment. *Soldal* concerned a circumstance where a family rented a lot for their trailer home but were subsequently evicted by the property management company and lot owner, resulting in the family's mobile home being removed from its foundation

-45-

and hauled off the property. *Soldal*, *supra*, at 61. It has also been established since *Tyler*, *supra*, at 510, that even if exigent circumstances may authorize an initial warrantless entry, once the exigency passes, the entry can violate Fourth Amendment rights. Plaintiffs contend that the Fire Marshall should have been aware of this rule. Plaintiffs contend that Barton, Stemple and Crofoot thus knew or should have known that authorizing the disposal of the house and its effects two days later would have violated their Fourth Amendment rights. As previously explained, it is not reasonable to conclude that the later entry to remove the house and its contents was simply a continuation of the initial seizure. The Individual Defendants have not articulated a reasonable basis for the warrantless re-entry onto Plaintiffs' property to remove the housing material and the house contents. Summary judgment on this claim will thus be denied.

## 2.    Plaintiffs' Procedural Due Process Claim Against the Individual Defendants

As discussed previously, pre-deprivation process is not required where the circumstances necessitated quick action or makes efforts to provide meaningful pre-deprivation process impracticable, so long as the State provides adequate post-deprivation procedure. *See Harris*, 20 F.3d at 1401. Defendants submit that if there is no constitutional violation, there can be no individual liability.

However, even if this Court finds a constitutional violation occurred, the individual Defendants assert that they are entitled to qualified immunity because under the facts of this case an objectively reasonable governmental officer could have determined that the situation necessitated quick action and that pre-deprivation process was impracticable, such that there is no violation of due process absent adequate post-deprivation remedies. The Sixth Circuit in *Harris*, *supra*, found an inverse condemnation action to be an adequate post-deprivation remedy in a similar case. There

-46-

are no Sixth Circuit cases finding an inverse condemnation action to be inadequate in the context of an emergency demolition. Thus, if this Court concludes that an inverse condemnation is not an adequate post -deprivation remedy, the law was not clearly established and the individual Defendants are entitled to qualified immunity. Further, as discussed above, the individual Defendants were acting pursuant to the authority granted to them by the City's Ordinance and had no reason to believe that their actions were constitutionally impermissible.

In response, Plaintiffs note that "since World War II, the 'just following orders defense' has not occupied a respectful position in our jurisprudence, and officers in such cases may be held liable under § 1983 if there is a reason why any of them should question the validity of that order." *Kennedy v. Cincinnati*, 595 F.3d 327, 337 (6th Cir. 2010) (citation and quotations omitted). Plaintiffs contends that it was objectively unreasonable to dispose of their property without first notifying them. Additionally, the Defendants' failure to make any attempt to contact the Plaintiffs before the demolition was also objectively unreasonable given that they had three hours to make that attempt before Rohde Brothers arrived to demolish the house. The only reason given for not trying to call was that it was a Saturday and not in the policy. Neither official claimed that they had no time to call. Plaintiffs believe that the officials were looking for the most expedient choice for their own convenience without regard to the Plaintiffs' protected rights. The Individual Defendants therefore cannot hide behind the shield of qualified immunity to escape liability.

The Individual Defendants, however, are not hiding behind a "just following orders" defense, but instead reasonably believed that they were acting within the boundaries of the Constitution because the law regarding emergency demolitions and the adequacy of pre- and post- deprivation remedies is not well-settled. The liability, if any, should rest with the City if the Ordinance violates

an individual's constitutional rights and qualified immunity would be appropriate to grant on this claim. However, as previously noted, a due process remedy is unavailable because Plaintiffs have an adequate post-deprivation remedy under a state inverse condemnation claim. Summary judgment on Plaintiffs' procedural due process claim against the Individual Defendants will thus be granted on this basis.

### 3.   Plaintiffs' Substantive Due Process Claim Against the Individual Defendants

As noted above, there are generally two types of substantive due process violations: (1) official acts that are unreasonable and arbitrary and may not take place no matter what procedural protection accompany them; and (2) official conduct that "shocks the conscience." *Harris*, 20 F.3d at 1405. Defendants contend that the City's Ordinance does not violate substantive due process, nor did the individual Defendants' actions under the Ordinance violate substantive due process. However, even if this Court finds a violation of substantive due process, the individual Defendants argue that they are entitled to governmental immunity because the individual Defendants actions were not objectively unreasonable in light of clearly established constitutional rights. Defendants are unaware of any precedent in the Sixth Circuit which would place the individual Defendants on notice that the emergency demolition of a house, where they had determined that there was an immediate and serious danger to the public safety, violates substantive due process rights. As in *Harris*, *supra*, even if Plaintiffs are correct that the house was not in immediate danger of collapse, at best Plaintiffs can establish a faulty decision made in haste. There is no evidence of bad faith on the part of the individual Defendants. The individual Defendants submit that they acted reasonably based upon the information available to them and pursuant to the authority granted by the Ordinance and are entitled to qualified immunity.

As previously noted, the Ordinance does not amount to a substantive due process violation and thus whether qualified immunity applies is inapposite. Even if a violation of substantive due process were found, Defendants acted reasonably based on the information they were provided and pursuant to the authority and standards outlined by the Ordinance.

### 4.    Plaintiffs' Federal Claims Against Rohde Brothers

It is unclear from the complaint which claims, if any, are directed toward Defendant Rohde Brothers. Defendants note that the complaint refers to "the City" and the "individual Defendants", neither of which include the corporate Defendant Rohde Brothers. Assuming that Plaintiffs allege that Rohde Brothers is a state actor and, as such, is one of the "individual Defendants" referred to in Counts I, II and III of Plaintiffs' Complaint, Rohde Brothers is entitled to summary judgment as to the constitutional claims on the same basis as the individual Defendants.

Moreover, Defendants submit that the qualified immunity arguments are even stronger as to Rohde Brothers because it did not make the decision to demolish the property but, rather, acted at the direction of Scott Crofoot. *See JC Flatford v. City of Monroe*, 17 F.3d 162, 170 (6th Cir. 1994) (concluding that police officers who implemented an eviction at the direction of the a building inspector were entitled to governmental immunity because requiring the police officers to second guess the more informed judgment of a building safety inspector would hinder effective and swift action and that the police officers should be afforded wide latitude to rely on a building safety officer's expertise where that expert determination appears to have some basis in fact). Here, there clearly was a basis in fact for the City's determination. Jack Wolfgram, the Rohde Brothers employee who actually performed the demolition, testified that he specifically recalled the demolition because one of the basement walls was caved in and the house had settled down. ECF

No. 11 Ex. G at 6. He further recalled that the City was afraid that the house was going to fall altogether. *Id.* Defendants request that qualified immunity likewise be extended to Rohde Brothers.

In response, Plaintiffs assert that the City has not provided any legal support for providing immunity to Rohde Brothers. Plaintiff does not otherwise explain why the authority advanced is insufficient. Based on Defendants' argument related to the holding in *Flatford*, qualified immunity is appropriate because Rohde Brothers was merely following the instructions from an individual with more informed judgment.

### C.    Plaintiffs' State Law Claims

Plaintiffs contend that it is unfair and premature to require that they respond to Defendants' arguments regarding their state law claims before the Court has determined whether or not it will exercise supplemental jurisdiction.  To the contrary, Defendants removed the case pursuant to 28 U.S.C. § 1441, with the Court having original jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 and, because the state law claims are so related to the federal claims, those too were removed pursuant to 28 U.S.C. § 1367(a). The Court need not affirmatively exercise jurisdiction over claims that have been properly removed by Defendants.

### 1.    Plaintiffs' Due Process Claims

Counts I and II of Plaintiffs' Complaint allege violations of due process under Article 1, Section 10 of the Michigan Constitution. Defendants contend that Plaintiffs' claims should be dismissed, because there is no inferred damage remedy available against a municipality and individual governmental employees for alleged violations of the Michigan Constitution. *See Jones v. Powell*, 462 Mich. 329, 335-37 (2000) ("[O]ur decision in *Smith* provides no support for inferring a damage remedy for a violation of the Michigan Constitution in an action against a municipality

or an individual government employee."); *Smith v. Michigan*, 256 F. Supp. 2d 704, 706-07 (E.D. Mich. 2003) ("Regardless of the constitutional provision, these claims must be dismissed; no inferred damages remedy exists against individual government employees for violation of a state constitutional right."). However, the court later noted in its *Jones* decision that the *Smith* ruling "only recognized a narrow remedy against the state on the basis of the unavailability of any other remedy." *Jones*, 462 Mich. at 336.  Here, as noted previously, Plaintiffs have the remedy of an inverse condemnation action and thus a damage remedy under the Michigan Constitution is unavailable.  Counts I and II, as it pertains to Plaintiffs' state law claims,  will be dismissed.

### 2.    Plaintiffs' State Law Tort and Statutory Claims Against the City

Count V alleges unlawful destruction or conversion of goods under Mich. Comp. Laws § 600.2920 and Michigan common law against the City and the Individual Defendants for the destruction of the fixtures, improvements and other personal property when the house was demolished. Plaintiffs appear to allege statutory conversion under Mich. Comp. Laws § 600.2920.7. This statute, however, provides that a civil action may be brought to recover possession of any goods or chattel that have been unlawfully taken or unlawfully detained. Defendants argue that the replevin statute does not apply here where Plaintiffs have specifically alleged that "remnants of the House, and possibly the fixtures and other household goods" were dumped in the Brent Run landfill." Compl. ¶ 33. Where the property sought to be recovered has been destroyed prior to the suit being commenced, replevin is not the proper remedy. *Gildas v. Crosby*, 61 Mich. 413, 417 (1886). Plaintiffs' statutory conversion claim thus fails as a matter of law.

Common law conversion is the intentional and distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein. *Department of*

*Agriculture v. Appletree Marketing LLC*, 485 Mich. 1, 13-14 (2010). Defendants have not argued that Plaintiffs' claim fails as a matter of law, but that the City is entitled to governmental immunity on this claim. Count VI alleges trespass on land pursuant to Mich. Comp. Laws § 600.2919 and the common law against the City and the individual Defendants. Common law trespass is any unauthorized intrusion or invasion of the private premises or lands of another. *Fruman v. City of Detroit*, 1 F. Supp. 2d 665, 675 (E.D. Mich. 1998). The intrusion must be intentional. *Terlecki v. Stewart*, 278 Mich. App. 644, 654 (2008). Mich. Comp. Laws § 600.2919(1) provides an additional statutory remedy for damages involving trespass regarding invasions on land that include the cutting, taking, or removing of trees and plants.

The Governmental Immunity Act affords broad protection from tort liability to governmental entities engaged in the discharge of a governmental function:

> Except as otherwise provided in this act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function. Except as otherwise provided in this act, this act does not modify or restrict the immunity of the state from tort liability as it existed before July 1, 1965, which immunity is affirmed.

Mich. Comp. Laws § 691.1407(1).

To maintain an action against a government agency, a plaintiff must plead in avoidance of immunity. *Mack v. City of Detroit*, 467 Mich. 186, 198-199; 649 NW2d 47 (2002). "A plaintiff pleads in avoidance of governmental immunity by stating a claim that fits within a statutory exception or by pleading facts that demonstrate that the alleged tort occurred during the exercise or discharge of a nongovernmental or proprietary function." *Id.* at 204. A "governmental function" is defined as "an activity that is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law." *Id.* (citing Mich. Comp. Laws § 691.140(f)). The City's

actions in this case were pursuant to its Ordinance authorizing the emergency demolition of dangerous buildings where there is an immediate and serious danger to the public safety and constitute a governmental function to which governmental immunity applies. Therefore, the City is immune from tort liability and Counts V and VI against the City will be dismissed.

### 3. Plaintiff's State Law Claims Against the Individual Defendants

Pursuant to Mich. Comp. Laws § 691.1407(2), "each officer and employee of a governmental agency . . . is immune from tort liability for an injury to a person or damage to property caused by the officer, employee . . . while in the course or employment or service . . . if all of the following are met:

> (a) The officer, employee . . . is acting or reasonably believes he or she is acting within the scope of his or her authority.
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
> (c) The officer's, employee's . . . conduct does not amount to gross negligence that is the proximate cause of the injury or damage. As used in this subdivision, "gross negligence" means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.

Mich. Comp. Laws § 691.1407(2). The statute further provides that Subsection (2) does not alter the law of intentional torts as it existed before July 7, 1986. Mich. Comp. Laws § 691.1407(3).

In *Odom v. Wayne County*, 482 Mich. 459 (2008), the Michigan Supreme Court specifically addressed whether a government employee is immune from liability for an intentional tort. The *Odom* Court held that immunity exists to the extent allowed by the common law prior to July 7, 1986. Thus, *Odom* reaffirmed the test from *Ross v. Consumers Power Co.*, 420 Mich. 567 (1984) (on rehearing), the pre-July 7, 1986 case defining individual governmental immunity from tort liability. The *Odom* Court set forth the following summary of the steps to follow when a defendant raises the affirmative defense of individual governmental immunity:

-53-

(1) Determine whether the individual is a judge, a legislator, or the highest ranking appointed executive official at any level of government who is entitled to absolute immunity under MCL 691.1407(5).

(2) If the individual is a lower-ranking governmental employee or official, determine whether the plaintiff pleaded an intentional or a negligent tort.

(3) If the plaintiff pleaded a negligent tort, proceed under MCL 691.1407(2) and determine if the individual caused an injury or damage while acting in the course of employment or service or on behalf of his governmental employer and whether

> a. The individual was acting or reasonably believed that he was acting within the scope of his authority,
>
> b. The governmental agency was engaged in the exercise or discharge of a governmental function, and
>
> c. The individual's conduct amounted to gross negligence that was the proximate cause of the injury or damage

(4) If the plaintiff pleaded an intentional tort, determine whether the defendant established that he is entitled to individual governmental immunity under the Ross test by showing the following:

> a. The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,
>
> b. The acts were taken in good faith, or were not undertaken with malice, and
>
> c. The acts were discretionary, as opposed to ministerial.

*Id.* at 479-80

Plaintiffs have pled claims for the intentional torts of trespass and conversion against the individual Defendants. Therefore, the test set forth in subpart (4) of the *Odom* steps applies. Defendants contend that here, the actions of Defendants Stemple, Crofoot and Barton were clearly within the scope of their authority. The Ordinance designates the Chief Inspector and the Fire Marshal as the persons with authority to make decisions regarding emergency demolitions. Further, in this case, Scott Crofoot, the Dangerous Buildings Inspector, was acting at the direction of and with the authority of his supervisor, John Stemple. At the very least, Defendants submit that all persons involved reasonably believed that they were acting within the scope of their authority.

Defendants contend that the actions by Stemple, Crofoot and Barton were also clearly taken in good faith and were not undertaken with malice. As employees of the City, they acted properly

-54-

upon receiving information regarding a dangerous building. Stemple directed Crofoot to respond to the scene, to call Barton and to take appropriate action. Crofoot and Barton each concluded that the situation was an immediate and serious threat to public safety and ordered that the demolition be conducted on an emergency basis without prior notice to the property owners. An action is not in good faith when the governmental employee acts maliciously or with a wanton or reckless disregard of the rights of another. *Odom*, 482 Mich. at 474. "[W]illful and wanton misconduct is made out only if the conduct alleged shows an intent to harm or, if not that, such indifference to whether harm will result as to be the equivalent of a willingness that it does." *Id.* at 475. The individual Defendants were acting to protect the public safety and did so in accordance with the City's Ordinance.

The final step requires distinguishing the conduct as either discretionary or ministerial. "A ministerial officer has a line of conduct marked out for him, and has nothing to do but to follow it . . . [d]iscretion, on the other hand, implies the right to be wrong [and] . . . requires personal deliberation, decision and judgment." *Id.* at 475-76, (internal citations omitted). In this case, Defendants argue that the Individual Defendants' actions were discretionary. Indeed, they assessed the situation, exercised their discretion to determine whether an emergency demolition was warranted, and determined that the emergency demolition was appropriate. The Court agrees that the Individual Defendants thus made discretionary decisions, in good faith, and are immune from tort liability pursuant to Mich. Comp. Laws § 691.1407.

Additionally, Defendants argue that Fire Marshal Greg Barton is entitled to absolute immunity pursuant to Mich. Comp. Laws § 691.1407(5) as the highest-ranking appointed executive official at his level of government. An "executive" as the term is used in the statute is a person

whose job pertains to or who is charged with the execution of laws or the administration of public affairs. *Nalepa v. Plymouth-Canton Comm. Sch. Dist.*, 207 Mich. App. 580, 589-90 (1994). The City's Ordinance grants the Fire Marshal the authority to order or direct the Chief Inspector to proceed under the emergency provisions of the Ordinance or he may do so himself. The Fire Marshal has the authority to order demolition of a building under the City's Ordinance. ECF No. 11 Ex. E, § 151.120. The Ordinance does not limit the Fire Marshal's authority or subject him to supervision in making these determinations. The Fire Marshal is responsible for the entire operation of the fire prevention division within the City, including the budget. Based on the applicable statutes and case authority, Defendants have demonstrated that Barton is entitled to absolute immunity.

#### 4.   Plaintiff's Exemplary Damages Claim

Count VII of Plaintiffs' Complaint seeks exemplary damages for Defendants' alleged willful and wanton destruction of property. A claim for exemplary damages is not a separate cause of action but a form of damages available in intentional tort cases if they compensate a plaintiff for the humiliation, sense of outrage, and indignity resulting from injuries maliciously, willfully and wantonly inflicted by the defendant. *See B & B Investment Group v. Gitler*, 229 Mich. App. 1, 9-10 (1998). Because Plaintiffs' state law tort claims are dismissed, Count VII must be dismissed as well.

### IV.   Conclusion

Accordingly, it is **ORDERED** that Defendants' motion for summary judgment (ECF No. 11) is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that Counts I, II, V, VI, and VII are **DISMISSED WITH PREJUDICE**.  Count III is **DISMISSED IN PART WITH PREJUDICE** as it pertains to the initial seizure during the demolition of the house.  At this juncture, Count III as it pertains to the

carrying away of the remaining fixtures, personal property, and effects and Count IV remain.

It is further **ORDERED** that the Court's scheduling order is **AMENDED** as follows:

| | |
|---|---|
| Motions in limine (ECF No. 25) hearing: | October 23, 2012 at 3:00 p.m. |
| Final Pretrial Order and Jury Instructions Due: | October 16, 2012 |
| Final Pretrial Conference: | October 23, 2012 at 3:00 p.m. |
| Jury Trial: | November 6, 2012 at 8:30 a.m. |

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: August 7, 2012

<div style="border:1px solid">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 7, 2012.

s/Tracy A. Jacobs
TRACY A. JACOBS

</div>